The following constitutes
the order of the court. Signed January 18, 2008

_____
Marilyn Morgan
U.S. Bankruptcy Judge
_____

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>SONICBLUE INCORPORATED, DIAMOND MULTIMEDIA SYSTEMS, INC., REPLAYTV, INC., and SENSORY SCIENCE CORPORATION,<br><br>Debtors. | Cases No. 03-51775, 03-51776, 03-51777, and 03-51778-MM<br><br>Chapter 11 cases<br>Jointly administered |
| SONICBLUE CLAIMS LLC, a Delaware Limited Liability Company,<br><br>Plaintiff,<br><br>vs.<br><br>PORTSIDE GROWTH & OPPORTUNITY FUND, a Cayman Islands Corporation; SMITHFIELD FIDUCIARY LLC, a Cayman Islands Corporation; and CITADEL EQUITY FUND LTD., a Cayman Islands Corporation,<br><br>Defendants. | Adv. No. 07-5082<br><br><br><br>**MEMORANDUM DECISION AND ORDER ON MOTION BY SONICBLUE CLAIMS LLC TO COMPEL PRODUCTION OF DOCUMENTS FROM PILLSBURY WINTHROP SHAW PITTMAN LLP, AMENDED JANUARY 18, 2008** |

## INTRODUCTION

Before the court is the motion of SonicBlue Claims LLC ("SBClaims") to compel production of documents from Pillsbury Winthrop Shaw Pittman, LLP (PWSP). The chapter 11 trustee, Dennis

1

Connolly, filed a statement in support of the motion. The trustee has waived all the debtors' privileges for the period of time before his appointment. As former counsel for the debtors, however, PWSP claims that at least 435 documents, reflecting communications among various PWSP attorneys, are protected from disclosure by its own attorney-client privilege and the work product doctrine.

The facts in this case are evolving as the chapter 11 trustee's investigation into PWSP's representation of the debtor is ongoing. The following recitation of facts is truncated to focus on the unfolding conflicts faced by PWSP as I presently understand them.

## **FACTUAL BACKGROUND**

PWSP has served as SONICblue's general corporate, securities, and litigation counsel since approximately 1989. SONICblue Incorporated and its three operating subsidiaries, Diamond Multimedia Systems, Inc., ReplayTV, Inc., and Sensory Science Corporation (collectively SONICblue), designed, developed, and marketed consumer electronic products.

In September 1996, SONICblue raised financing by a private placement of 5¾% subordinated convertible debentures (the "Junior Notes") with a face value of $103.5 million that were acquired at a discount by various entities (the "1996 Noteholders").

In January 2001, SONICblue formed S3 Graphics Co., Ltd., a joint venture with VIA Technologies, Inc., to operate SONICblue's graphics chip business. SONICblue contributed its graphics intellectual property to the joint venture, including rights under a patent cross-license with Intel Corporation. These intellectual property rights were so valuable that the joint venture agreement included a liquidated damages clause entitling the joint venture and VIA each to damages from SONICblue of up to $70 million if the joint venture were ever enjoined from using the Intel cross-license. From the inception of the joint venture, there were serious disputes and threatened litigation between SONICblue and VIA.

In April 2002, after it was already experiencing financial difficulties, SONICblue raised additional financing from a $75 million private placement issuance of 7¾% senior secured subordinated convertible debentures (the "Senior Notes"). The Junior Notes are contractually subordinated to the Senior Notes. Three institutional bondholders, Portside Growth & Opportunity Fund Ltd., Smithfield

2

**MEMO. DECISION AND ORDER ON MOTION BY TO COMPEL, AMENDED JANUARY 18, 2008**
Case: 07-05082    Doc# 80    Filed: 01/18/08    Entered: 01/18/08 09:12:50    Page 2 of 17

Fiduciary LLC, and Citadel Equity Fund Ltd. (the "2002 Noteholders"), acquired the Senior Notes at a discount for $62.5 million.

The indenture for the Senior Notes provided that the notes were subordinated to all Senior Indebtedness, defined as follows:

> (g) All indebtedness of the Company due and owing to Via Technologies, Inc. in an aggregate principal amount not to exceed $15,000,000 or the equivalent thereof in any other currency of composite currency (the "Via Indebtedness"). . . .

In connection with its representation of SONICblue regarding the private placement offering for the Senior Notes, PWSP issued to the 2002 Noteholders an opinion letter on April 22, 2002 concerning the enforceability of the debentures and the related agreements, stating in pertinent part:

> 2. . . . [T]he Purchase Agreement, the Registration Rights Agreement, the Indenture, the Pledge and Security Agreement and the Option Agreement, when duly executed and delivered by the Buyers, will each constitute a valid and binding agreement of the Company, enforceable against the Company in accordance with its terms.
>
> \* \* \*
>
> 3. The issuance and sale of the Debentures have been duly authorized. Upon issuance and delivery against payment therefor in accordance with the terms of the Indenture and the Purchase Agreement, the Debentures will constitute valid and binding obligations of the Company, enforceable against the Company in accordance with their terms.
>
> \* \* \*
>
> 9. . . . (b) Our opinion in paragraph 2 above is subject to and limited by (i) the effect of applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, receivership, conservatorship, arrangement, moratorium or other laws affecting or relating to the rights of creditors generally. . . .

In what may have been a scrivener's error, the bankruptcy limitation in paragraph 9 referenced only paragraph 2 of the opinion letter concerning the related agreements and not paragraph 3 concerning the debentures themselves.

Shortly after the issuance of the Senior Notes, SONICblue was unable to meet its maturing financial obligations and entered into an engagement agreement for PWSP to represent it in restructuring its debt. PWSP's engagement agreement dated October 25, 2002 states: "The Firm agrees that it will not represent any person other than SONICblue in connection with this engagement or SONICblue's chapter 11 filing." Continuing operating losses forced SONICblue and its operating subsidiaries to file

3

chapter 11 petitions on March 21, 2003. PWSP's initial Bankruptcy Rule 2014 disclosures filed April 11, 2003 were unremarkable for a large firm:

> 3. The Firm has been engaged as the Debtors' corporate and litigation counsel since approximately 1989. During that time, the Firm has provided legal representation to the Debtors in a variety of areas, including corporate and securities matters, mergers and acquisitions, litigation, and intellectual property matters. The Firm has been working with the Debtors in connection with their restructuring since approximately October 25, 2002 when the Firm was retained to provide advice concerning the restructuring of the Debtor's liabilities and business operations.
>
> * * *
>
> 6. . . . [T]he Firm, and certain of its partners, counsel, and associates may have in the past represented, and may presently and likely in the future will represent creditors or stockholders of the Debtors in matters unrelated to these Chapter 11 Cases. A preliminary conflicts search performed at my direction discloses that the Firm may have represented or represents entities that are involved in some capacity with one or more of the Debtors, or may have some other relationships with these entities, in matters unrelated to the Debtors. To the best of my knowledge, the Firm's relationships with these entities is as follows. . . .

It added, "The Firm will continue to monitor its relationship with the creditors and other parties in interest in these cases and, as it discovers additional information requiring disclosure, will promptly supplement this application with any appropriate disclosures." However, PWSP did not disclose its issuance of the opinion letter to the 2002 Noteholders in connection with the private placement offering one year earlier.

The Office of the United States Trustee appointed an Official Committee of Unsecured Creditors the same date that the petitions were filed. The committee, as originally constituted, was comprised of eight members, including each of the 2002 Noteholders, Portside Growth and Opportunity Fund, Ltd., Smithfield Fiduciary LLC and Citadel Equity Fund Ltd. After the initial months of the case, however, only the three 2002 Noteholders and two other creditors remained active on the committee.

*Conflict with the Directors and Officers*

On April 21, 2005 several of the 1996 Noteholders (the "Noteholder Plaintiffs") filed a complaint in state court against the former officers and directors of SONICblue, including the last remaining director, the former Chief Financial Officer, who was serving as the responsible individual in the case. The lawsuit asserted claims for breach of fiduciary duty and constructive fraud, contending

4

**MEMO. DECISION AND ORDER ON MOTION BY TO COMPEL, AMENDED JANUARY 18, 2008**
Case: 07-05082   Doc# 80   Filed: 01/18/08   Entered: 01/18/08 09:12:50   Page 4 of 17

that the defendants improperly authorized and caused SONICblue to issue the Senior Notes in 2002 while it was in the zone of insolvency and hopelessly unable to honor its long-term bond obligations to the 1996 Noteholders.

The defendants removed the action to this court on June 14, 2005 on the basis that they may have substantial claims for contribution and indemnification against the debtor. SONICblue tendered its defense of the claim to its insurer pursuant to directors' and officers' liability policies (the "D&O Policy"). The D&O Policy covered claims first made against the officers and directors between December 16, 2002 and December 16, 2003. The insurer declined coverage.

Thereafter, on December 23, 2005, the primary and the excess insurers filed a complaint for declaratory relief in this court. The insurers contend that the officers and directors received the first of several demand letters from counsel for the Noteholder Plaintiffs on July 11, 2002, before the policy period. They also contend that from July 2002 through the commencement of the policy period on December 16, 2002, counsel for the officers and directors, counsel for the 1996 Noteholders, and counsel for the 2002 Noteholders engaged in discussions concerning a dispute over the insolvency of SONICblue, the duties owed by the officers and directors, and the potential breach of their fiduciary duties to creditors. Notwithstanding these discussions, SONICblue failed to disclose any existing demands for relief against the officers and directors in their application for coverage. The insurers sought reformation of the D&O Policy to exclude the undisclosed claims or, alternatively, rescission of the D&O Policy. The officers and directors asserted counterclaims for damages against the insurance carriers. The court stayed the coverage action pending disposition of the noteholder litigation.

Over the course of a four-day mediation that extended from October 13, 2005 through June 6, 2006, the Noteholder Plaintiffs, the defendant officers and directors, and the insurance carriers entered into a stipulation for settlement. The settlement terms provide that the Noteholder Plaintiffs will recover only to the extent that insurance coverage exists. Pursuant to the stipulation, the Noteholder Plaintiffs substituted into the coverage action in place of the officers and directors and have become the real parties in interest. The Noteholder Plaintiffs dismissed the underlying lawsuit with prejudice on May 4, 2007. The coverage lawsuit remains pending.

Based on the insurance carriers' refusal to provide coverage in the noteholder litigation, counsel for the officers and directors apparently made demand on PWSP and requested a tolling agreement in or around June 2006. June 26, 2006 is the date of the first document for which PWSP claims privilege. PWSP, in fact, entered into a tolling agreement with the officers and directors on August 18, 2006 recognizing, "[D]isputes have arisen as to whether Pillsbury is liable to the Directors for damages that may have been incurred by the Directors as a result of the Coverage Denial . . . ." The tolling agreement operates to suspend the applicable statutes of limitations from the effective date of the agreement until further notice. PWSP did not at any time disclose to the court the demand by the officers and directors or the existence of the tolling agreement. Internal correspondence between PWSP attorneys shows that PWSP was aware as early as June 13, 2005 that the insurers' refusal to provide coverage posed a potential problem in PWSP's representation of SONICblue. On that date, the partner in charge of this bankruptcy case received an email communication that the insurance carrier declined coverage for the noteholder litigation, including the following commentary:

> This has some ramifications for our representation of the company at the time of the transactions at issue as well as the current situation. Note the reference particularly to the effort by the bankrupt entity we represent to take action that would place the insurance in jeopardy. . . . [N]ot sure who is handling this but I think we ought to consider this from all perspectives, including that of the firm's involvement at various stages.

The author of that email also forwarded it to an associate working on the bankruptcy case, adding: "Needless to say the position taken about the insurance policy on behalf of the bankruptcy estate that facilitates the rescission of the policy is troubling." The associate then forwarded the email to a colleague, also working on the bankruptcy case, under a cover that states: "This is that email that I thought seems to blame us for Admiral's efforts to get out of coverage." Notwithstanding these articulated concerns about PWSP's potential liability, it declined to reveal the potential claim in five subsequent Bankruptcy Rule 2014 supplemental disclosures filed after June 2005.

*Conflicts Arising from the Opinion Letter*

In the progress of this bankruptcy case, VIA and S3 Graphics filed proofs of claim for $70 million each, asserting that SONICblue had breached the joint venture agreement by failing to fulfill its duties in the operation of the joint venture. SONICblue countered by objecting to the claims and filing

6

an adversary complaint for affirmative relief. It asserted a breach by VIA and S3 of the joint venture agreement and a breach by VIA of its fiduciary duties in the operations of the joint venture and the settlement of patent litigation with Intel. Concurrently, SONICblue was engaged in litigation with Intel Corporation concerning the parties' respective rights under the patent cross-license. Because of PWSP's prior representation of Intel, PWSP represented the debtors only in the VIA litigation. The debtors retained special litigation counsel in the dispute with Intel.

SONICblue, VIA, and S3 commenced settlement discussions in earnest in August 11, 2005 when the parties and their counsel met and ultimately included Intel in attempts to reach a global settlement. Although not party to the action, counsel for the 2002 Noteholders actively participated in the discussions concerning the terms of such a settlement.

In September 2005, counsel for VIA and SONICblue reached a tentative agreement for a settlement of $12.5 million, subject to the agreement of their respective clients and the creditors. The debtor, VIA, and S3 agreed to the settlement amount without condition. However, the 2002 Noteholders, who were participating as interested parties, only consented to the settlement on the condition that it include, *inter alia*, a provision that the allowed claim be neither senior nor junior to other general unsecured claims. Inclusion of this provision would be beneficial for the 2002 Noteholders because it would entitle them to an additional $8 million from the estate, but with the result that general unsecured creditors would receive less. VIA agreed to language waiving "Senior Indebtedness" status on June 1, 2006 and the settlement agreement was filed under seal.

Neither the motion to approve the settlement or the notice to creditors highlighted the waiver of Senior Indebtedness status of VIA's claim or addressed its significance to creditors. September 6, 2006 is the date of the first document for which PWSP claims privilege on this subject. The court approved the settlement with VIA on October 31, 2006.

In prosecuting the objections to claims by the estate, PWSP analyzed the claims of both the 2002 Noteholders and the 1996 Noteholders. On July 20, 2006, PWSP sent an email to counsel for the 2002 Noteholders asserting that their claim may be subject to partial disallowance under § 502(b)(2) to the extent of the unamortized original issue discount.

7

**MEMO. DECISION AND ORDER ON MOTION BY TO COMPEL, AMENDED JANUARY 18, 2008**
Case: 07-05082    Doc# 80    Filed: 01/18/08    Entered: 01/18/08 09:12:50    Page 7 of 17

> [I]n light of the anticipated distribution in these cases (in the range of 30-35% assuming substantive consolidation), disallowance of OID will result in your clients not receiving 100% of the principal and interest due on their claim. . . .

PWSP's analysis reflected that the unamortized portion of the original issue discount was just over $43 million. In response, counsel for the 2002 Noteholders reminded PWSP of the April 22, 2002 opinion letter and demanded indemnification from PWSP for any shortfall to which the 2002 Noteholders may be subjected as a result of SONICblue's objection to their claim. On September 5, 2006, he wrote to PWSP's managing partner:

> In . . . its Opinion Letter, Pillsbury Winthrop represented that SONICblue's Debentures were "valid and binding obligations of the Company, enforceable against the Company in accordance with their terms." Under each Debenture, SONICblue agreed to pay the Debenture Holder "Twenty-Five Million Dollars and 00/100 ($25,000,000.00)," the full principal amount of each Debenture . . . .
>
> If we are unable to obtain SONICblue's payment of the full principal amount, the Debenture Holders intend to pursue claims for, perhaps among other things, negligent misrepresentation and negligence, against Pillsbury Winthrop in connection with the April 22, 2002 Opinion Letter.

PWSP then notified committee counsel of the demand for indemnification by the 2002 Noteholders and transferred to the committee the responsibility for prosecuting the objection to claim. PWSP forwarded its work file to committee counsel on September 6, 2006. However, PWSP did not submit a supplemental Bankruptcy Rule 2014 statement to disclose the claim asserted against it by the 2002 Noteholders. When it filed its eighth interim application for compensation on October 18, 2006, with respect to the objection to the claim of the 2002 Noteholders, PWSP simply stated, "The matter was turned over to the Creditors' Committee for prosecution."

The joint disclosure statement and plan prepared by PWSP and committee counsel disclosed PWSP's conflict *vis-à-vis* the 2002 Noteholders in a cursory fashion:

> [U]ntil recently, the Debtors were in charge of analyzing the Senior Notes claims. However, as a result of a conflict that has been asserted by the Senior Noteholders with respect to counsel to the Debtors, the Creditors' Committee is now in charge of analyzing the Senior Notes Claims.

In response to creditor inquiry, the disclosure statement was amended to elaborate on the description of the conflict of debtors' counsel, as follows:

> [U]ntil recently, counsel to the Debtors was in charge of analyzing the Senior Notes Claims. As a result of the Senior Noteholders' contention that counsel to the Debtors had pre-petition issued to the Senior Noteholders an unqualified legal opinion that the

8

Senior Notes were enforceable against the Debtors in accordance with their terms, counsel to the Debtors requested the Creditors' Committee to assume the role of analyzing the Senior Notes Claims.

Despite the significance of the provision, the disclosure statement cryptically described the Senior Indebtedness waiver:

> Under the settlement, among other things, VIA and [S3] received a $12.5 million general unsecured claim against SONICblue (which VIA agreed is not senior indebtedness under the documentation evidencing the Senior Notes) . . . .

Moreover, nothing suggested that for every dollar the 2002 Noteholders benefitted by the waiver, PWSP's corresponding exposure for indemnification decreased.

However, in February 2007, SBClaims brought to light the facts underlying the conflict, filing copies of PWSP's April 22, 2002 opinion letter and the September 5, 2006 demand by the 2002 Noteholders for indemnification from PWSP. That same month, the United States Trustee brought a motion to appoint a chapter 11 trustee and, five days later, a motion to disqualify PWSP as debtor's counsel based on the appearance of improprieties raised by PWSP's conflict and the firm's failure to disclose the conflict.

Only after the United States Trustee's motion for disqualification of PWSP was on file, did PWSP file a supplemental Bankruptcy Rule 2014 disclosure on March 5, 2007, stating:

> Portside Growth and Opportunity Fund, Ltd., Smithfield Fiduciary LLC and Citadel Equity Fund Ltd. (collectively, the "Senior Noteholders"), are holders of the 7¾% Senior Secured Subordinated Convertible Debentures due 2005 (the "Senior Notes"). The Debtors scheduled the claim of the Senior Noteholders for in excess of $77 million, and each of the three Senior Noteholders filed its own proofs of claim in unspecified amounts related to the Senior Notes. In connection with its Application, the Firm previously disclosed its substantial pre-petition representation of the Debtors, including for corporate and securities matters. As part of that representation, the Firm represented SONICblue in issuing the Senior Notes. As is typical in such financing transactions, the Firm issued a legal opinion to the Senior Noteholders. Pursuant to letter dated September 5, 2006, counsel to the Senior Noteholders sought indemnity from the Firm related to the Senior Notes (the "Demand"). The Firm has rejected the Demand and declined to provide any indemnity to the Senior Noteholders, and immediately upon receipt of the Demand the Firm informed counsel for the Creditors' Committee of the Demand and turned over the analysis of all issues regarding the allowance of the Senior Noteholders' claims to the Committee. No lawyer in the firm who handled the financing transaction was involved in the firm's analysis regarding the Senior Noteholders' claims. Whether the Demand creates any disabling conflict or renders the Firm not "disinterested" is presently before the Court on motions filed by the U.S. Trustee.

9

At the March 19, 2007 hearing on the United States Trustee's motions to disqualify PWSP and to appoint a trustee, outside counsel for PWSP asserted that PWSP did not have its debtor clients' consent to oppose the motion for disqualification. He expressed that:

> The current circumstances have put Pillsbury in a difficult position because with the accusations against it and the effort to disqualify the firm it has not been able to confer with its client or advise its client, the Debtor, or the Debtors, about what their preferences might be or what would be appropriate in terms of responding to the request for relief that are before the Court today . . . .[O]n the difficult issues of what the Debtors' position would be on disqualification, on what the Debtors' position would be on retaining Pillsbury as Debtors' counsel in a general counsel capacity or any more limited capacity we simply have not been able to speak with the firm's client.

This was the first time that outside counsel, Howard, Rice, Nemerovski, Canady, Falk & Rabkin, PC, appeared on behalf of PWSP. Additionally, the debtors appeared at that hearing through proposed special counsel.

After the motions were granted, the United States Trustee selected Dennis J. Connolly on April 16, 2007 to serve as trustee. Upon his appointment, the court directed the trustee to conduct an investigation of the apparent improprieties that had transpired to date and to propose a remedy for the lack of disclosures.

On May 30, 2007, SBClaims, having acquired the VIA claim, commenced this adversary proceeding against the 2002 Noteholders for equitable subordination and reclassification of their claim and seeking a declaration that the VIA claim is entitled to "Senior Indebtedness" status. The discovery in this proceeding has been consolidated with the trustee's investigation pursuant to a joint discovery plan. Through discovery, SBClaims has uncovered the August 18, 2006 tolling agreement between PWSP and the officers and directors.

*Omissions*

Over the course of the case, PWSP assisted the debtors in liquidating the substantial assets of the estates, amassing approximately $84 million for distribution to creditors and received interim compensation of approximately $4 million. During that period, PWSP filed seven supplemental disclosures on May 30, 2003, January 23, 2004, October 27, 2004, July 13, 2005, July 27, 2005, November 4, 2005, and June 5, 2006, all of which were unremarkable. None mention the opinion letter

**UNITED STATES BANKRUPTCY COURT**
**For The Northern District Of California**

1  that PWSP provided to the 2002 Noteholders or the tolling agreement with the officers and directors.
2  Neither the disclosure statement nor the first amended disclosure statement revealed the waiver in the
3  VIA settlement or that the Chief Financial Officer and responsible individual of the debtors was a
4  defendant in the litigation by the Noteholder Plaintiffs. The debtors and the committee did not address
5  the fact that the 2002 Noteholders were controlling members of the committee, which had been charged
6  with objecting to the claim of the very same 2002 Noteholders. PWSP did not disclose its opinion letter
7  assuring payment, the demand by the 2002 Noteholders for indemnification, or the benefit that PWSP
8  stood to realize from full payment of the 2002 Noteholders.

*Positions of the Parties*

10 SBClaims and the trustee seek further information in order to better understand PWSP's conduct
11 and motives. PWSP seeks to protect at least 435 communications with in-house counsel documented
12 in its privilege log. As of the hearing date, PWSP had not provided a privilege log of its
13 communications with its outside counsel, Howard, Rice.

### LEGAL DISCUSSION

**I.  PWSP Cannot Use The Attorney-Client Privilege Or The Work Product Doctrine To Shield Its Communications With In-House Counsel After Its Conflict Of Interest Became Apparent.**

The attorney-client privilege is one of the oldest privileges known to common law, and its policy of protecting the administration of justice by encouraging full and frank communication between attorneys and their clients is a time-honored one. *Upjohn v. United States*, 449 U.S. 383, 389, 101 S. Ct. 677, 682 (1981). Nevertheless, as with all privileges, its goal is counter-balanced by the equally fundamental legal concept that fact-finders are entitled to every litigant's evidence. Because the attorney-client privilege operates to withhold relevant evidence from the fact-finder, it should be construed narrowly and only applied where necessary to achieve it purpose. *Fisher v. United States*, 425 U.S. 391, 403, 96 S. Ct. 1569, 1577 (1976). Strict construction also reflects the assumption that lawyers are consulted to comply with, not break, the law. If circumstances erode that underlying premise, then the protection accorded by the privilege should, correspondingly, diminish. *Id.* The burden of establishing the applicability of the privilege lies with the party asserting it.

11

In light of these competing principles, courts generally have followed a restrictive approach in granting the protection of attorney-client privilege to confidential communications with in-house legal counsel. *Bank Brussels Lambert v. Credit Lyonnais (Suisse)*, 220 F. Supp. 283, 286 (S.D.N.Y. 2002). Moreover, a law firm's consultation with in-house counsel, like that of PWSP's here, raises an additional layer of concern that is unique to the legal profession. As one court noted, "[a] law firm's representation of a client, and its ability to meet its ethical and fiduciary obligations to that client, may be affected by its representation of another client, even if the second client is the law firm itself." *In re Sunrise Securities Litigation*, 130 F.R.D. 560, 595 (E.D. Pa. 1989). In other words, when a law firm chooses to represent itself, it runs the risk that the representation may create an impermissible conflict of interest with one or more of its current clients. In light of these ethical concerns, the courts that have considered the issue have resoundingly found that, where conflicting duties exist, the law firm's right to claim privilege must give way to the interest in protecting current clients who may be harmed by the conflict. *Id.*; *Burns v. Hale and Dorr LLP*, 242 F.R.D. 170 ( D. Mass. 2007); *Thelen Reid & Priest LLP v. Marland*, 2007 WL 578989 (N.D. Cal. Feb. 21, 2007); *Koen Book Distributors v. Powell, Trachtman, Logan, Carrle, Bowman & Lombardo P.C.*, 212 F.R.D. 283 (E.D. Pa. 2002); *Bank Brussels*, 220 F. Supp. 283. As a result, a law firm cannot assert the attorney-client privilege against a current outside client when the communications that it seeks to protect arise out of self-representation that creates an impermissible conflicting relationship with that outside client.

At the same time, public policy encourages lawyers to consult with in-house counsel to understand and comply with their professional responsibilities and ethical restraints. Elizabeth Chambliss, *The Scope of In-Firm Privilege*, 80 Notre Dame L. Rev. 1721 (2005). This policy favors allowing the privilege to be asserted until such time as the firm has, or should have, determined that dual representation of itself and an outside client should not continue without the informed consent of the outside client. *Accord Thelen*, 2007 WL 578989, at *7-8.

PWSP's argument that this case law is not controlling and is contrary to the Ninth Circuit's limitations on the fiduciary exception to the attorney-client privilege is unpersuasive. In *United States v. Mett*, 178 F.3d 1058 (9th Cir 1999), the Ninth Circuit held that an ERISA plan administrator, a fiduciary, was disabled from asserting the attorney-client privilege against the plan beneficiaries for any

12

legal advice it received regarding administration of the ERISA trust. This is known as the fiduciary exception to the attorney-client privilege. The court also found, however, an exception to that exception. Where a fiduciary seeks legal advice, on its own behalf, not that of the trust, in an effort to defend against beneficiaries' claims of improper trust administration, the attorney-client privilege could be asserted. By analogy, PWSP asserts that it is entitled to the benefit of the *Mett* personal liability exception to the fiduciary exception. Because all the communications for which it claims privilege were part of legal advice that PWSP sought on its own behalf in its effort to defend against the several claims that have been lodged against it, PWSP urges that *Mett* applies to keep PWSP's right to invoke the attorney-client privilege intact.

PWSP's argument fails to account for the unique attributes of the fiduciary relationship between the firm as the attorney and its client, SONICblue. First, the very nature of the attorney-client relationship exceeds other fiduciary relationships where the fiduciary must execute its duties faithfully on behalf of its beneficiaries. Attorneys are governed by an ethical code that requires the utmost loyalty on the part of the attorney, including the duty not to represent another client if it would create a conflict of interest with the first client. Second, the scope of PWSP's fiduciary relationship with SONICblue included much more than simply administering an ERISA plan as in *Mett*. In *Mett*, the Ninth Circuit recognized that the fiduciary could not assert the attorney-client privilege against its beneficiaries for all matters within the scope of its fiduciary duties - there, the administration of the ERISA plan. Here, however, the scope of PWSP's fiduciary duties were broad-ranging and prohibited PWSP from engaging in any activity that was adverse to SONICblue's interests. Applying *Mett*'s reasoning, PWSP cannot invoke the privilege as to any matter within that broad scope of fiduciary activities. This would include its failure to comply with its duty of loyalty by entering into a second representation that created a conflict with its representation of SONICblue. Finally, it is important to note that in this bankruptcy setting there is an additional overlay of fiduciary duties. Under the Bankruptcy Code, PWSP, as debtor's counsel, had a duty to remain disinterested and not to represent any adverse interests. It owed this duty not just to SONICblue but to the creditors on whose behalf it was administering the estate and to the court. The ethical lapses alleged against PWSP clearly fall within the scope of the broad fiduciary

13

duty that it owed to all of these parties. As a result, PWSP's personal defense theory will not excuse production in the conflict of interest context.

In addition to the attorney-client privilege, PWSP has also asserted the work product doctrine as a basis for withholding many of the documents listed in its privilege log. Like the attorney-client privilege, however, the protections afforded by the work product doctrine are not absolute. The policies discussed above apply equally to PWSP's claims of work product. As one court explained, in the conflict of interest context, the work product doctrine does not protect an attorney's papers any more or less than the attorney-client privilege. *Thelen*, 2007 WL 578989, at *8, *citing*, *Koen Book*, 212 F.R.D. at 286.

Turning to the record currently before the court, it appears that PWSP had some inkling of impending ethical issues as early as June 2005 when emails among several lawyers in the firm expressed concern over the ramifications of the insurance coverage dispute. Nevertheless, the present record does not establish the existence of a conflict at that time. Circumstances giving rise to at least a potential conflict arose in or around June 2006, when SONICblue's officers and directors requested the tolling agreement from PWSP. Still, there may have been a short period of time following that request, but before any conflict of interest became apparent, during which PWSP attorneys sought in-house advice regarding the firm's ethical duties to SONICblue. Even so, the evidence plainly establishes that PWSP knew of its conflicting interests by the time the firm executed the tolling agreement with the SONICblue's directors on August 18, 2006. As to this issue, on that date, PWSP's ability to withhold intra-firm communications related to its representation of SONICblue became impaired. Similarly, by September 5, 2006, when the 2002 Noteholders made their indemnification demand, PWSP knew it had another disabling conflict of interest. Finally, by January 2007, PWSP was aware that accusations regarding malpractice and its failure to adequately disclose conflicts of interest had arisen. In light of this evidence, PWSP has no right to claim privilege for any communications with in-house counsel between September 7, 2006 and March 26, 2007 that are set forth in its privilege log.

14

**MEMO. DECISION AND ORDER ON MOTION BY TO COMPEL, AMENDED JANUARY 18, 2008**
Case: 07-05082   Doc# 80   Filed: 01/18/08   Entered: 01/18/08 09:12:50   Page 14 of 17

**II. The Current Record Does Not Establish That An Exception From The Attorney-Client Privilege Applies To PWSP's Communications With Its Outside Counsel.**

In support of its argument that PWSP should be compelled to produce its communications with Howard, Rice, SBClaims offers two theories. First, PWSP allegedly breached fiduciary duties owed to its client by revealing client confidences to Howard, Rice without SONICblue's permission and, therefore, should lose its ability to assert privilege just as it did with respect to in-house counsel communications once a conflict of interest developed. Second, SBClaims argues that the crime-fraud exception to the attorney-client privilege applies because the consultations with Howard, Rice are part of a scheme to further, or at least cover-up, a fraud on the court.

With respect to the first theory, research has not uncovered any decision where a court denied the application of the privilege between a law firm and its outside counsel due to the law firm's breach of a fiduciary duty owed to its own client, and SBClaims has offered none. Further, there is no evidence in the record demonstrating that any fiduciary duty has been violated in PWSP's consultations with Howard, Rice. While SBClaims "can only imagine" the extent of PWSP's shared confidences with Howard, Rice, it would be improper for this court to compel production based on imaginings or supposition.

Turning to SBClaims' second theory, communications otherwise protected by the attorney-client privilege will not be shielded from disclosure if they are made in furtherance of a crime, fraud or other misconduct. *In re Napster, Inc. Copyright* Litigation, 479 F.3d 1078, 1090 (9th Cir. 2007). To receive the benefit of outright disclosure based on the crime-fraud exception to the attorney-client privilege, SBClaims must establish, by a preponderance of the evidence, that PWSP was engaged in or planning a criminal or fraudulent scheme at the time of its communications with Howard, Rice. *Id.* at 1090. It also must demonstrate that the attorney-client communications were sufficiently related to and in furtherance of the intended scheme. *Id.*

While SBClaims has offered some evidence that suggests that a fraud might have been committed, at this juncture, PWSP's privilege log does not include its communications with Howard, Rice. As a result, it is impossible to identify the communications at issue or to determine whether they were made in furtherance of an alleged fraudulent scheme. While the privilege log, once provided, may

15

or may not be enough to make that determination, it is a necessary starting point. Additionally, PWSP has not yet been provided an opportunity to offer countervailing evidence. As the Ninth Circuit held in *Napster*, where a party requests outright disclosure of documents based on their connection to a crime or fraud, the party seeking to preserve the privilege has the right to introduce countervailing evidence.

## CONCLUSION

Consistent with this memorandum decision, PWSP shall produce, within ten business days of receipt of this decision, all documents for which it claims either attorney-client or work product privilege in its privilege log after its conflicting interests became apparent. Based on the record before me, all conflicting interests became apparent no later than September 6, 2006. Within that same ten business day period, PWSP may submit for *in camera* inspection, any of the five documents, dated on or before September 6, 2006 and listed on the privilege log, which PWSP believes, in good faith, falls outside the class of documents to be produced. PWSP shall provide an explanation as to why any document submitted *in camera* should be excluded from discovery. Otherwise, PWSP shall produce those documents as well.

Good cause appearing, IT IS SO ORDERED.

**\* \* \* END OF ORDER \* \* \***

16

**MEMO. DECISION AND ORDER ON MOTION BY TO COMPEL, AMENDED JANUARY 18, 2008**
Case: 07-05082   Doc# 80   Filed: 01/18/08   Entered: 01/18/08 09:12:50   Page 16 of 17

**UNITED STATES BANKRUPTCY COURT**
**For The Northern District Of California**

Adv. No. 07-5082-MM

# SERVICE LIST

| | |
|---|---|
| Robert A. Greenfield<br>Frank A. Merola<br>K. John Shaffer<br>STUTMAN, TREISTER & GLATT PC<br>1901 Avenue of the Stars, 12th Floor<br>Los Angeles, CA 90067 | William McGrane<br>Bernard S. Greenfield<br>Christopher D. Sullivan<br>ONE FERRY BUILDING, SUITE 220<br>SAN FRANCISCO, CA 94111 |
| Cecily A. Dumas<br>FRIEDMAN DUMAS & SPRINGWATER LLP<br>150 Spear Street, Suite 1600<br>San Francisco, CA 94105 | Grant T. Stein<br>ALSTON & BIRD LLP<br>1201 West Peachtree Street<br>Atlanta, GA 30309 |
| James L. Lopes<br>Steven E. Schon<br>Bernard A. Burk<br>HOWARD RICE NEMEROVSKI CANADY FALK & RABKIN<br>Three Embarcadero Center, 7th Floor<br>San Francisco, CA 94111-4024 | John M. Grenfell<br>Michael P. Ellis<br>PILLSBURY WINTHROP SHAW PITTMAN LLP<br>50 Fremont Street<br>San Francisco, CA 94105-2228 |
| Nanette Dumas<br>OFFICE OF THE UNITED STATES TRUSTEE<br>280 South First Steet, Suite 268<br>San Jose, CA 95113-0002 | Aron M. Oliner<br>DUANE MORRIS LLP<br>One Market Plaza<br>Spear Street Tower, Suite 2000<br>San Francisco, CA 94105-1104 |
| Lewis Kruger<br>Kenneth Pasquale<br>STROOCK, STROOCK AND LAVAN<br>180 Maiden Lane<br>New York, New York 10038 | Kurt E. Ramlo<br>Glen Walter<br>SKADDEN, ARPS, SLATE, MEAGHER & FLOM<br>300 South Grand Avenue, #3400<br>Los Angeles, CA 90071-3144 |

17

**MEMO. DECISION AND ORDER ON MOTION BY TO COMPEL, AMENDED JANUARY 18, 2008**
Case: 07-05082   Doc# 80   Filed: 01/18/08   Entered: 01/18/08 09:12:50   Page 17 of 17